UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY POXSON,

                 Plaintiff,                       Civil Action No. 2:11-cv-15503

        v.                              District Judge George Caram Steeh
                                            Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.
_____/

**REPORT AND RECOMMENDATION TO
<u>AFFIRM THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY [9, 12]</u>**

Plaintiff Tracy Poxson appeals the final decision of Defendant Commissioner of Social Security denying her application for Disability Insurance Benefits and Supplemental Security Income. (*See* ECF No. 1, Compl.) Before the Court for a Report and Recommendation (ECF No. 3) are the parties' cross-motions for summary judgment (ECF Nos. 9, 12). In her motion, Plaintiff asserts that the disability decision must be reversed because the reasons for discounting her credibility are not supported by substantial evidence. (ECF No. 9, Pl.'s Mot. Summ. J. at 4.)

For the reasons set forth below, this Court finds that the Administrative Law Judge gave adequate reasons, supported by substantial evidence, for discounting Plaintiff's credibility. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

# I.  PROCEDURAL HISTORY

Tracy Poxson filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 22, 2008.  (Tr. 143, 149.)  In both applications she alleged a disability onset date of April 30, 2006.  (Tr. 11.)  The Commissioner of Social Security ("Commissioner") initially denied these applications on January 13, 2009.  (Tr. 11.)  Plaintiff then requested an administrative hearing, and on December 15, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") Richard P. Gartner, who considered her case *de novo*.  (Tr. 11-22, 27-59.)  In a March 25, 2011 decision, ALJ Gartner found that Plaintiff was not disabled.  (*See* Tr. 11-22.)  His decision became the final decision of the Commissioner on October 20, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on December 16, 2011.  (ECF No. 1, Compl.)

# II.  FACTUAL BACKGROUND

Plaintiff alleges that she became unable to work on April 30, 2006.  (Tr. 11.)  She was 24 years old at that time and 29 when the ALJ issued his disability decision.  (*See* Tr. 11, 143.)  Plaintiff completed high school and one year of college.  (Tr. 55.)  She has past work experience as a cashier and selling cell phones at a mall.  (Tr. 35-36.)  Plaintiff has four children, the youngest of whom lives with her.  (Tr. 31.)  Plaintiff has also had the same boyfriend since 2006.  (Tr. 42.)

## A.  Plaintiff's Testimony at the Hearing Before the ALJ

At the December 15, 2010 hearing before the ALJ, Plaintiff testified about the physical and mental impairments that she believed prevented her from working.  Regarding her physical condition, she described neck and back pain due to degenerative disc disease.  (Tr. 37.)  She stated that a cervical fusion in 2009 improved her pain "for a little while," but "the numbness in [her]

hands and feet [came] back." (Tr. 37-38.) Plaintiff told the ALJ that her primary-care physician treated her back and neck pain with medication (methadone). (Tr. 39-40.) She testified that she was not receiving treatment for any other physical problems. (Tr. 40.)

Regarding her mental health, Plaintiff stated that she felt nervous and anxious around people. (Tr. 49.) She also stated that she would get frustrated at work which led to her overreacting and screaming at people. (*Id.*) She further testified that she had attempted suicide "[p]robably 15" times, most recently in 2009. (Tr. 50.) When asked about a "real bad day," Plaintiff responded that on such a day she "would[] [not] get out of bed at all." (Tr. 52.) She stated that these bad days "sometimes" occurred once a month. (Tr. 52.) Plaintiff testified that she was attending counseling and taking medication prescribed for her mental conditions. (Tr. 41.)

In terms of daily activities, Plaintiff stated that, other than attending her therapy sessions, she sat at home. (Tr. 44.) Regarding housework, she explained, "I [sometimes] have a hard time . . . doing anything. I just kind of sulk on the couch . . . ." (Tr. 48.) When asked about taking care of her five-year-old child, she responded that her boyfriend would normally bring him outside to play. (Tr. 48.) She admitted, however, that she went to the grocery store, to her boyfriend's house (where they occasionally watch rented movies), and out to dinner once a month. (Tr. 44.) She also described a four-night trip to Las Vegas where she saw shows, went out to eat, and walked the "strip." (Tr. 46.) She also provided that she went on a trip to Mackinac city the year before. (Tr. 47.) In response to the ALJ's inquiry, Plaintiff stated that she had 600 Facebook friends. (Tr. 52-53.)

### B. Medical Evidence

#### 1. Plaintiff's Back and Neck Condition

3

The record suggests that Plaintiff started reporting back pain in January 2008.  (*See* Tr. 453, 752.)  Contemporaneous x-rays revealed a "reversal of the usual lordotic curvature which may be due to spasm, pain, or developmental." (*Id.*)  The x-rays also showed, however, that Plaintiff did not have degenerative disc disease and that her neural foramina were normal.  (*Id.*)

Beginning in February 2008, Plaintiff attended physical therapy for her neck pain.  During the course of her sessions, Plaintiff reported pain levels ranging from three- to six-out-of-ten.  (Tr. 291-94, 303-08, 478.)

In April 2008, Plaintiff went to the emergency room for right-side neck pain.  (Tr. 276.)  An exam revealed muscle spasm and a decreased range of motion.  (*Id.*)  Plaintiff was given a discharge prescription of Vicodin.  (*Id.*)

The next month, Plaintiff returned to the emergency room for back pain.  (Tr. 271.)  A physical exam revealed tenderness in Plaintiff's right shoulder and scapula, her cervical spine, and her posterior neck.  (Tr. 272.)  She was diagnosed with cervical radiculitis and given discharge prescriptions of Valium for anxiety and Darvocet for pain.  (Tr. 273.)  Also in May 2008, an MRI was taken of Plaintiff's cervical spine.  (Tr. 442.)  The impression was "[v]ery minimal disc bulge at C5-6 without any central canal stenosis or neural foraminal encroachment[;] otherwise [an] unremarkable MRI of the cervical spine."  (*Id.*)[1]

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae.  The *central canal* of the spinal column conveys the spinal cord.  At each disc level, e.g., C5-C6, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs.  Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, *Lumbar Spinal Stenosis: Diagnosis and Treatment Options* (June 1999); The Cleveland Clinic, *Lumbar Canal Stenosis*, http://my.clevelandclinic.org/disorders/stenosis_spinal/hic_lumbar_canal_stenosis.aspx (visited May 22, 2012); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, *Herniated Disk*, http://www.mayoclinic.com/health/bulging-disk/AN00272 (visited May 23, 2012).

In late August 2008, Plaintiff went back to the emergency room for neck pain. (Tr. 795.) The emergency-room physician noted, "No history to suggest radiating pain to legs. . . . Nothing in [patient's] history to suggest cervical spasm/torticollis. No history of upper extremity weakness or paralysis." (Tr. 796.) Plaintiff was discharged with a prescription of Darvocet, a narcotic pain medicine. (*Id.*)

About a week later, on September 7, 2008, Plaintiff returned to the emergency room for back pain; she reported, "I have a bulging disc in my neck . . . and it is making my shoulder hurt and I have numbness down my right arm." (Tr. 243.) Plaintiff was diagnosed with muscle spasms in her neck and cervical disc disease. (Tr. 243.) Later that month, on September 30, 2008, Plaintiff underwent an electromyographic study for right, upper extremity numbness and neck pain. (Tr. 426.) The EMG, however, was normal. (*Id.*; *see also* Tr. 789.)

In January 2009, Plaintiff was treated in the emergency room for a fall and resulting injury to her coccyx. (Tr. 750, 755.) Plaintiff was discharged in an "improved" condition and was able to walk in the hospital lobby "fast" and "stead[ily]" without apparent distress. (*Id.*)

After the fall, Plaintiff began physical therapy. (Tr. 751-54.) She reported right-side neck pain with the pain occasionally radiating to her mid-thoracic area. (Tr. 752.) Her pain level ranged from one- or two-out-of-ten to five- or six-out-of-ten. (*Id.*)

In May 2009, Plaintiff underwent another cervical MRI which was compared with the MRI from May 2008. (Tr. 899.) The MRI revealed "progression of degenerative disc disease at C5-C6." (Tr. 900.) It also showed "focal protrusion/disc herniation causing indentation of the thecal sac and mild cord contour effacement." (*Id.*)

In August 2009, Plaintiff was examined in advance of scheduled cervical-spine surgery. (Tr.

840.)  The surgeon summarized the history of Plaintiff's condition as follows:

> [Ms. Poxson] has neck pain as well as arm pain.  She reports that this
> has been ongoing for a year and a half.  She indicates that she woke
> up one day with severe pain. . . .  She describes her arm pain as
> numbness and tingling throughout her . . . hands . . . .  The pain
> comes intermittently [and] does not seem to be tied with activity.

(*Id.*)  Plaintiff underwent a cervical diskectomy and fusion on August 11, 2009.  (Tr. 836-37.)

In the second half of 2010, Plaintiff sought treatment for back or neck pain from Dr. Horace

Davis, her primary-care physician.  In July 2010, Plaintiff reported an average pain level of eight-

out-of-ten without medication, but two-out-of-ten with medication.  (Tr. 588.)  Plaintiff also reported

no side effects from the medication.  (*Id.*)  In September 2010 and on October 15, 2010, Plaintiff's

pain scores were similar.  (Tr. 596.)  On October 27, 2010, however, Plaintiff went to the emergency

room with back pain and some paresthesias in her hands and feet.  (Tr. 598.)  Plaintiff was provided

medication and told to followup with Dr. Davis.  (*Id.*)  At her followup exam, Plaintiff reported pain

at ten-out-of-ten without medication with medication only reducing her pain score to six-out-of-ten.

(Tr. 601.)  Dr. Davis' assessment was chronic pack pain.  (Tr. 603; *see also* Tr. 604.)

### 2. *Plaintiff's Mental Impairments*

In or around January 2006, Plaintiff began seeing Dr. Khawaja Rehman for anxiety.  (*See*

Tr. 348.)  Dr. Rehman prescribed Plaintiff Xanax and Zoloft.  (Tr. 348.)

In April 2006, Plaintiff was hospitalized after taking approximately 100 ibuprofen tablets.

(Tr. 347.)  Plaintiff explained to the hospital staff that her then-boyfriend had broken up with her

just two days prior, and that she was having to work long hours and therefore had less time to spend

with her child.  (*Id.*)  She also reported that she started using cocaine right after the breakup.  (*Id.*)

She told the emergency-room physician that she did not intend to commit suicide by taking the

ibuprofen, but primarily wanted attention.  (*Id.*)  Plaintiff was diagnosed with depressive disorder, not otherwise specified, with rule-out diagnoses of major depressive disorder and substance induced depression.  Plaintiff was discharged with an increased prescription of Zoloft, and Seroquel was substituted for Xanax because Plaintiff said that Seroquel helped her sleep.  (Tr. 349.)

In a May 2006 post-emergency room followup, Dr. Rehman noted that Plaintiff was "under pressure" and that she "just want[ed] . . . to be at home and do home things."  (Tr. 362.)  At that time, Plaintiff was working 55 hours a week to support her child.  (Tr. 362.)

The next month, Plaintiff reported to Dr. Rehman that she had been feeling very anxious.  (Tr. 360.)  Dr. Rehman modified her medications and suggested that Plaintiff attend counseling.  (*Id.*)  Plaintiff apparently responded that she was too busy for counseling.  (*Id.*)

About two years later, in June 2008, Plaintiff underwent a psycho-social assessment for upcoming treatment at the Center for Counseling.  (Tr. 543.)  She reported anger and sadness, poor sleep, and low energy.  (Tr. 543.)  She further provided that her boyfriend was "controlling" and described a troubled childhood (including being raped at age 16, an alcoholic mother, and a religious-fanatical father).  (Tr. 543-44.)  The therapist noted, "She immediately begins to identify her boyfriend as the source for all her current stress.  She reports that [they] have a violent relationship [and] that they argue constantly.  She also . . . admits that she refuses to leave him [because] she is taken care of financially."  (Tr. 546.)  The therapist diagnosed Plaintiff with major depression; she included a rule-out diagnosis of bipolar disorder and assigned Plaintiff a Global Assessment Functioning ("GAF") score of 45 to 50.  (Tr. 546.)[2]

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  *American Psychiatric Assoc. Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV*"), 30-34 (4th ed., Text Revision 2000).  It ranges from 100

Plaintiff attended counseling at the Center for Counseling from September through November 2008. (Tr. 547-51.) On November 10, 2008, Plaintiff continued to report contempt for her boyfriend. (Tr. 547.)

In December 2008, Dr. Thomas Horner conducted a mental status exam for Disability Determination Services ("DDS"). (Tr. 553-62.) Plaintiff reported that, just three days earlier, she had broken-up with her boyfriend. (Tr. 555.) Dr. Horner noted that Plaintiff was therefore staying at a friend's house; relatedly, he noted that Plaintiff had friends and got along with her neighbors. (Tr. 556.) After Dr. Horner performed a thorough mental-status exam, he diagnosed Plaintiff with mixed anxiety and depression, a history of major depressive episodes, a history of rape with recurring post-traumatic stress symptoms, and borderline personality disorder. (Tr. 560.) He assigned Plaintiff a GAF score of 55. (*Id.*)[3] Dr. Horner also completed a mental medical source statement: he indicated that Plaintiff had moderate difficulties in responding appropriately to work pressures and between slight and moderate difficulties in responding appropriately to changes in a routine work setting. (Tr. 561.) He opined that Plaintiff had no difficulties with any of the other work-related tasks listed on the form (e.g., understanding, remembering, and carrying out detailed instructions). (*Id.*)

─────────────────────

(superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM-IV* at 34.

[3]A GAF score of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM–IV* at 34.

In January 2009, Dr. Rom Kriauciunas reviewed Plaintiff's medical file and completed a Mental Residual Functional Capacity Assessment form and a Psychiatric Review Technique Form for the DDS.  Dr. Kriauciunas provided the following RFC assessment:

> Claimant is able to do simple, low-stress, unskilled work on a sustained basis.  Claimant is moderately limited in [her] ability to understand, remember, [and] carry out detailed instructions, [and in her ability] to maintain attention and concentration for extended periods.  Also, [she] is moderately limited in ability to interact appropriately with the general public, to maintain socially appropriate behavior and/or adhere to basi[c] standards of neatness and cleanliness, and to respond appropriately to changes at work.

(Tr. 565.)

In May 2009, Plaintiff swallowed a battery which required an emergency medical procedure to remove the battery from her stomach.  (*See* Tr. 897.)  The operating physician noted that Plaintiff had "a few scars on her arm from self-infliction four days ago."  (Tr. 898.)  Further, while at the hospital, Plaintiff asked for a shotgun and told staff that she would go home and swallow forty more batteries.  (Tr. 874-75.)  The administrative record reflects that hospital staff completed a Petition for Hospitalization with the State of Michigan due to these threats.  (Tr. 877-80.)  A psychiatric consult was also ordered.  (Tr. 874.)  She told the consulting psychiatrist, Dr. Hassan Almat, that she had swallowed the battery mistakenly without noticing, and that her threats of self-harm were made out of frustration with the hospital staff's treatment.  (Tr. 875.)  Plaintiff denied suicidal ideation but Dr. Almat found that Plaintiff's judgment and insight were poor.  (Tr. 875-76.)  He agreed to allow Plaintiff to be released to see Dr. Rehman on the condition that she was escorted directly to Dr. Rehman's office.  (Tr. 875.)

About six months later, in January 2010, Plaintiff began mental-health treatment at Recovery Technology.  Plaintiff reported feeling very anxious and experiencing a lot of stressors, including

9

fights with her boyfriend.  (Tr. 679.)  Plaintiff also reported difficulty staying on task and pacing. (Tr. 658.)

In February 2010, Plaintiff went to the emergency room with a "chief complaint" of "overdose": she had taken two Xanax and one Seroquel.  (Tr. 802.)  The emergency-room records, however, do not indicate treatment for drug overdose: instead, Plaintiff was treated for pepper spray exposure.  (Tr. 805.)

In March 2010, Plaintiff went to the emergency room for anxiety.  (Tr. 635.)[4]  It appears that her anxiety or depression prescriptions had been stolen.  (Id.)  Plaintiff was given a one-time dose of Nubian for her anxiety.  (Tr. 636, 640.)  The emergency-room physician spoke with Dr. Rehman; he did not want Plaintiff to obtain medications from other care providers.  (Tr. 639.)  Plaintiff was instructed to followup with Dr. Rehman.  (Id.)

In July 2010, due to Dr. Rehman's retirement, Plaintiff began treating with Dr. Satish Cham. (Tr. 689-91.)  Dr. Cham performed a mental-status exam and found that Plaintiff's mood was pleasant, that she had no paranoid thinking, and that she denied being depressed.  (Tr. 690.)  Dr. Cham also noted, however, that her "insight remain[ed] poor and practical judgment [was] questionable."  (Tr. 691.)  He diagnosed Plaintiff with mixed depression, borderline personality and ADHD by history, and assigned Plaintiff a GAF score of 50.  (Tr. 690.)

"Individual Progress Notes" from Recovery Technology indicate that from June through December 2010 Plaintiff made "some progress" toward her treatment goals, which included further developing skills to regulate her emotions (anger, depression, and anxiety).  (Tr. 650, 654, 656, 658,

---

[4]Plaintiff appears to have gone to the emergency room quite frequently for a number of other conditions not relevant to the claims of error Plaintiff has raised on appeal (e.g., kidney stones and migraines).

10

665, 666, 669, 674, 692, 694, 696, 701-703, 708, 710, 712, 716, 718, 722, 724, 726, 727, 729, 732, 735, 737.) For example, in August 2010, Plaintiff reported that she had continued to use her "skills" and "[r]ecalled [a] recent interaction with [her boyfriend]" that, in the past, would have caused her to get "angrier and probably even violent." (Tr. 732.) In October 2010, Plaintiff similarly reported to her Recovery Technology therapist that she had been using her skills to deal with her emotions and that she had been experiencing less impulsive behaviors and thoughts. (Tr. 718.) In December 2010, Plaintiff noted frustration with her boyfriend's poor treatment of her, but believed that she would return to making poor decisions and drugs without him. (Tr. 696.)

### C. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with Plaintiff's functional limitations. The VE offered testimony about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of "light" work (as defined in the Social Security Regulations), but physically restricted to (1) "occasional" postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, (2) "occasional" overhead work, (3) "occasional" pushing and pulling with the arms and legs, and (4) no exposure to dangerous machinery or unprotected heights, and mentally limited to (1) "simple routine repetitive tasks, not performed in a fast-paced production environment, involving only simple work-related decisions and in general relatively few workplace changes," and (2) "occasional interaction with the general public." (Tr. 56-57.) The VE responded that this hypothetical individual could work as a night cleaner, laundry folder, or "cleaner polisher," each with thousands of jobs available in Michigan's lower peninsula. (Tr. 57.)

## III. FRAMEWORK FOR DISABILITY DETERMINATIONS

11

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status)  and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

12

to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## IV. THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

At step one, ALJ Gartner found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of April 30, 2006. (Tr. 13.) At step two, he found that Plaintiff had the following severe impairments: cervical degenerative disc disease, status-post fusion at C5-C6; borderline personality disorder; post-traumatic stress disorder; mixed anxiety and depression; history of opiate dependence; and history of major depressive episodes. (Tr. 14) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 14-15.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] can only occasionally perform balancing, stooping, kneeling, crouching, crawling, climbing ramps and stairs, and overhead work. She must avoid climbing ladders, ropes, and scaffolds. She can occasionally perform pushing and pulling with the upper and lower extremities to include the operation of hand levers and foot pedals. She should not be exposed to dangerous machinery and unprotected heights. She is also limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and relatively few work place changes. She is also limited to only occasional interaction with the general public.

(Tr. 15.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 20.) At step five, the ALJ found that jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 21.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 22.)

## V. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it

14

must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by The Courts" (internal quotation marks omitted)).

## VI. ANALYSIS

Ms. Poxson raises a single claim of error on appeal.  While acknowledging that the ALJ's decision "adequately summarizes the available medical evidence," she argues that the ALJ used a "selective process" in "interpret[ing]" the medical evidence to discount her credibility.  (ECF No. 9, Pl.'s Mot. Summ. J. at 5.)  Similarly, Plaintiff claims that "the ALJ failed to consider the record as a whole.  Selective portions of the extensive medical exhibits were used to support a tainted decision."  (Pl.'s Mot. Summ. J. at 7.)  Essentially, Plaintiff maintains that the ALJ "cherry picked" the administrative record for medical evidence that would discount her credibility without taking into account contrary evidence that either tempers the relied-upon evidence or, stronger, directly supports her testimony.

The question for the Court, therefore, is, after examining the record as a *whole*, whether substantial evidence supports the reasons the ALJ provided to discount Plaintiff's credibility, and, in turn, whether those reasons that are substantially supported justify the ALJ's discounting of Plaintiff's credibility.  *See* 20 C.F.R. § 404.1529(c)(4) ("We will consider your statements about the . . . limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are

disabled.  We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you."); S.S.R. 96-7p, 1996 WL 374186 at *2 (providing that an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").  In making the latter inquiry, the Court must generally avoid second-guessing an ALJ's credibility determination.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (holding that a court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying.").  For the reasons that follow, the Court finds that Plaintiff has not demonstrated reversible error.

### A.  The ALJ Did Not Reversibly Err in Discounting Plaintiff's Testimony Regarding the Severity of Her Mental and Emotional Impairments

The ALJ evaluated Plaintiff's testimony regarding her mental impairments in significant part as follows:

> From a mental standpoint, the claimant is receiving treatment for some anxiety and depression as well as a borderline personality disorder.  She sought treatment at Recovery Technology in January 2010 because she was experiencing many stressors in her life and was not getting along consistently with her boyfriend as they fight often. She was given a GAF of 60 which is indicative of moderate symptoms and only one point away from having only mild symptoms.  It appears as though most of the claimant's individual therapy sessions were centered around her anxiety over fighting with her boyfriend.  The fact that she has difficulty getting along with, and fighting with, her boyfriend is not a credible reason for an inability

16

> to perform work activity.  In assessing the claimant's credibility, the
> undersigned notes that she has good activities of daily living
> including caring for her 5-year-old son, driving 20 miles a week to
> the grocery store and her therapy, spending at least 5 nights a week
> with her boyfriend, and going to movies.  She also indicated that she
> went to Las Vegas in April 2010 and spent at least 4 days there going
> to shows and walking around the main strip.  This was after her neck
> surgery.  She traveled north to Mackinac City as well.  The claimant
> also said she does not have many friends but then testified that she
> has a Facebook account on the computer with over 600 friends.

(Tr. 19.)

While there may be other, stronger reasons for the ALJ to have concluded that "the limiting

effects of [the claimant's alleged symptoms] are not credible to the extent they are inconsistent with

the . . . residual functional capacity assessment" (Tr. 19), the above rationale is not unreasonable and

is supported by the record.  For one, it is not a mischaracterization of Plaintiff's Recovery

Technology treatment records to say that one of the primary problems Ms. Poxson expressed — if

not her primary complaint — was her relationship with her boyfriend.  And it was not unreasonable

for the ALJ to further conclude that difficulties in a personal relationship do not necessarily imply

work-related difficulties in a professional relationship.  The ALJ also correctly noted that Plaintiff

engaged in social activities including spending time at her boyfriend's house, watching movies with

her boyfriend, going on at least two significant social outings (Las Vegas and Macinac), and actively

using Facebook.  Moreover, as will be discussed further below, the ALJ further relied on medical

evidence to support his mental RFC assessment.  (*See e.g.*, Tr. 16-17 (discussing Dr. Horner's

mental functioning assessment).)  The ALJ's reasoning must also be taken in view of the significant

mental-functioning limitations he included in his RFC assessment: "simple, routine, repetitive tasks,

not performed in a fast-paced production environment, involving only simple, work-related

decisions, . . . relatively few work place changes. . . . [and ]only occasional interaction with the

17

general public."  In all, the Court cannot say that the ALJ unreasonably concluded that limiting effects of Plaintiff's mental impairments were "not credible to the extent they are inconsistent" with this restrictive mental RFC assessment.

Plaintiff argues that a contrary conclusion is required primarily for three reasons.  For one, Plaintiff takes issue with the ALJ's use of her testimony about 600 Facebook friends.  (Pl.'s Mot. Summ. J. at 5.)  Plaintiff may be correct that not all Facebook "friends" are friends in the traditional sense.  But the ALJ's reliance on Plaintiff's Facebook friends need not be viewed so narrowly; rather, the ALJ reasonably implied that Plaintiff's active use of Facebook (which "Millions of people use . . . everyday to keep up with friends, upload an unlimited number of photos, share links and videos, and learn more about the people they meet," Facebook, http://www.facebook.com/facebook?sk=info (last visited Sept. 5, 2012)) weighed against her testimony about "sulk[ing] on the couch," having only "two" friends, and, to a lesser extent, nervousness and anxiousness around people.  Moreover, the ALJ's reliance on Plaintiff's use of Facebook was not solitary: he bundled it with Plaintiff's other social activities to get a more complete picture of the severity of Plaintiff's social impairments.  In short, the ALJ's relatively minimal reliance on Plaintiff's Facebook use was not unreasonable.

Next, Plaintiff points out (twice) that "[a] consultative examiner[,] [Dr. Horner,] indicated that her depression may cause her to miss work."  (Pl.'s Mot. Summ. J. at 5, 7.)  The ALJ acknowledged this statement.  (Tr. 17.)  And while he might have done more to address the remark, the Court will not fault the ALJ for not discussing further an entirely ambiguous "may."  Indeed, Dr. Horner did not even specify how much work Plaintiff "may" miss.  Moreover, the essence of Plaintiff's appeal is that the ALJ must examine the record as a whole; yet the remainder of Dr.

18

Horner's assessment is almost entirely in accord with the ALJ's RFC assessment.  Dr. Horner concluded that Plaintiff had no difficulties in understanding, remembering, or carrying out simple (or detailed) instructions; making simple work-related decisions; or interacting appropriately with the public, supervisors, and co-workers.  (Tr. 561.)  While he did find that Plaintiff was moderately limited in responding appropriately to work pressures and slightly-to-moderately limited in responding appropriately to changes in a routine work setting, (Tr. 561), Plaintiff has not shown how this is inconsistent with the ALJ's mental RFC assessment: "simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and relatively few work place changes," (Tr. 15).

Plaintiff next implies that the ALJ did not fairly consider her suicide attempts.  (Pl.'s Mot. Summ. J. at 5.)  But the ALJ discussed all of Plaintiff's suicide attempts dating back to 2006 (when the administrative record begins).  The ALJ noted that Plaintiff had taken over 100 ibuprofen pills in April 2006, but that she took the pills primarily because she wanted her boyfriend's attention after a very recent breakup.  (Tr. 15-16.)  The ALJ also acknowledged that in May 2009 Plaintiff swallowed a battery and then "voiced out suicidal ideation." (Tr. 18.)  The ALJ noted, however, that "Claimant said she was not suicidal."  (Tr. 18.)  Finally, the ALJ also acknowledged that, in February 2010, "[p]rior to being taken into police custody, she tried to overdose by taking two Xanax and one Seroquel." (Tr. 18.)

Plaintiff's suicide attempts are undoubtedly troubling.  But this is not a case where the ALJ overlooked this evidence.  Rather, he considered the attempts and noted significant explanations or qualifications for them.  And, as even argued by Plaintiff, her suicide attempts must be taken in the context of the entire record.  To this end, the ALJ correctly noted that Plaintiff had been using skills

19

she developed at Recovery Technology (*compare* Tr. 17 *with* Tr. 649, 651, 653, 654, 655), that, in a July 2010 evaluation with Dr. Cham (Dr. Rehman's replacement), Plaintiff denied suicidal or homicidal thoughts (*compare* Tr. 17 *with* Tr. 690), and, as already discussed, that Plaintiff testified to engaging in not insignificant social activities.  Further, Dr. Horner, with knowledge of Plaintiff's ibuprofen overdose, provided a medical source statement in accord with the ALJ's mental RFC assessment.  (*Compare* Tr. 16-17 *with* Tr. 558.)

In sum, Plaintiff's arguments present a different view of the evidence pertaining to her mental and emotional impairments.  And the Court acknowledges that the ALJ could have weighed this evidence differently and evaluated Plaintiff's testimony differently.  A more limited residual functional capacity assessment might also be supported by the record evidence.  But none of these are the appropriate inquiry for this Court.  *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently . . . and even if substantial evidence also supports the opposite conclusion").  For the reasons stated, the ALJ's credibility determination regarding Plaintiff's mental impairments is reasonable and supported by substantial evidence.

### B.  The ALJ Did Not Reversibly Err in Discounting Plaintiff's Testimony Regarding the Severity of Her Physical Impairments

Plaintiff also claims that the ALJ erred in evaluating her alleged neck and back pain. Plaintiff says that to "further impugn" her credibility, the ALJ cited her testimony regarding alleged back pain and then pointed to "the lack of evidence supporting her contentions or significant and limiting pain in her neck after her cervical fusion."  (Pl.'s Mot. Summ. J. at 6.)  Plaintiff refers to the following credibility analysis:

>At the hearing and in her visits to the emergency room, the claimant indicated that she had low back pain which she indicated was quite severe. She added that she was diagnosed with degenerative disc disease in her back but there is no diagnostic study with respect to her lumbar spine included in the record. There are no records showing objective evidence of any real findings. She was diagnosed with a herniated disc in her cervical spine and underwent a fusion in 2009, but there is very little evidence showing that she continues to experience significant and limiting pain in her neck.

(Tr. 19.)

The Court fails to see how this reasoning is flawed. Plaintiff has not directed the Court to any objective testing demonstrating significant lumbar-spine problems. In fact, Plaintiff concedes that her "complaints of back pain have not been deduced by objective testing." (Pl.'s Mot. Summ. J. at 7.) As for her cervical spine, it appears that in the one-year immediately following her cervical diskectomy, Plaintiff did not receive any significant medical treatment for her neck pain or paresthesias. When Plaintiff ultimately began treatment with Dr. Davis, she generally reported pain in the mild-to-moderate range: in July, September, and early-October 2010, Plaintiff reported pain with medication at or around the two-out-of-ten level; in late-October and November 2010, Plaintiff reported six-out-of-ten pain with medication. (Tr. 588, 596, 601, 603.) Further, at her November 2010 exam, Dr. Davis found, or Plaintiff reported, that her pain did not "interfere[] with . . . employment." (Tr. 603.)

Plaintiff also asserts that an examiner attributed Plaintiff's back or neck pain with cervical radiculitis. (Pl.'s Mot. Summ. J. at 7.) But, as the ALJ noted, two days after this diagnosis, an MRI revealed "[v]ery minimal disc bulge at C5-6 without any central canal stenosis or neural foraminal encroachment[;] otherwise [an] unremarkable MRI of the cervical spine." (Tr. 16, 442.) And, as the ALJ also noted, a September 2008 EMG was negative. (Tr. 18, 426.) Thus, the cervical

radiculitis diagnosis, taken in view of the other evidence of record, does not show that the ALJ's credibility assessment was in error.

Plaintiff next claims that "[c]ontrary[] to the ALJ's assertion that little evidence showed continued neck pain[,] . . . Dr. Davis has treated Ms. Poxson with strong prescribed medications after her surgery . . . ."  The Court does not disagree that a current pain-medication prescription supports a finding of continued pain.  And this inference is arguably contrary to the ALJ's statement that Plaintiff "was diagnosed with a herniated disc in her cervical spine and underwent a fusion in 2009, but there is little evidence showing that she continues to experience significant and limiting pain in her neck."  (Tr. 19.)  But not necessarily so.  As just noted, Plaintiff's pain was not reported as severe when she took her medication.  Further, Plaintiff reported that her medication did not have any side effects.  (Tr. 596, 601, 602.)  In fact, Dr. Davis found, or Plaintiff reported, that "[patient] can do everything" while on medication.  (Tr. 603; *see also* Tr. 599.)  Thus, the ALJ arguably concluded that — while on medication — "there is little evidence showing that she continues to experience significant and limiting pain in her neck."  (Tr. 22.)  Plaintiff has not shown that the ALJ's statement necessarily lacks substantial evidentiary support.

And even assuming she has, Plaintiff never testified to any functional limitations beyond those already included in the ALJ's RFC.  Plaintiff testified that her hands and feet "go numb."  (Tr. 38.)  This, however, says nothing about frequency or duration, or, more importantly, what Plaintiff would be prevented from doing while her hands and feet were numb.  Plaintiff, therefore, has not shown that the ALJ's possibly erroneous statement about ongoing pain was harmful.  *See Shinseki v. Sanders*, 556 U.S. 396 (2009) (holding that the burden is on the party attacking the Department of Veterans Affairs' decision to prove that Department's error was not harmless ); *McLeod v. Astrue*,

640 F.3d 881, 887 (9th Cir. 2010) (applying the holding in *Shinseki* to social security disability cases).

In sum, as with Plaintiff's claim of error regarding the ALJ's assessment of her mental and emotional impairment allegations, Plaintiff's claim that the ALJ selectively interpreted the medical evidence pertaining to her back and neck problems simply amounts to a disagreement about how the ALJ should have weighed the evidence. But reversal is not warranted unless Plaintiff takes the further step of showing that the ALJ's credibility evaluation, in view of the entire record, lacks substantial evidentiary support. She has not done so.

## VII. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ gave adequate reasons, supported by substantial evidence, for discounting Plaintiff's credibility. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VIII. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  September 21, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on September 21, 2012.

s/Jane Johnson
Deputy Clerk

24